**Jeffrey THOMPSON, Plaintiff**

v.

**Shirley Moore SMEAL,
et al., Defendants.**

**Civil Action No. 3:11–CV–340.**

United States District Court,
M.D. Pennsylvania.

Signed Oct. 16, 2014.

Alexandra T. Morgan–Kurtz, PA Institutional Law Project, Sara J. Rose, American Civil Liberties Foundation of Pennsylvania, Pittsburgh, PA, for Plaintiff.

Debra S. Rand, Chief Counsel's Office, Mechanicsburg, PA, for Defendants.

### *MEMORANDUM*

WILLIAM J. NEALON, District Judge.

On February 22, 2011, Plaintiff, Jeffrey Thompson, an inmate currently confined at the State Correctional Institution in Camp Hill, Pennsylvania, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 for violations of his First Amendment and Fourteenth Amendment rights "relative to the exercise of religious freedom and in violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA)." (Doc. 1, p. 3, ¶ 8). Plaintiff requests declaratory relief that he is entitled to "two (2) Christian feasts annually; Christmas and Easter." (Doc. 1, p. 5, ¶ 16). On April 19, 2012, this Court granted Defendants' cross motion for summary judgment and closed the case. (Docs. 65–66). On February 1, 2013, the United States Court of Appeals for the Third Circuit granted Plaintiff's appeal and remanded this matter for further proceedings. (Doc. 78).

Following discovery, Plaintiff and Defendants both filed motions for summary judgment on February 21, 2014. (Docs. 163 & 167). Defendants moved for summary judgment on Plaintiff's First Amendment and RLUIPA claims. (Doc. 164, pp. 18–24). Plaintiff moved for summary judgment under the RLUIPA. (Doc. 168, p. 8, n. 1). Following briefs and exhibits being filed, Magistrate Judge Karoline Mehalchick[1] filed a Report and Recommendation ("R & R") on July 30, 2014 opining that there are factual disputes and Plaintiff's and Defendants' motions for summary judgment should be denied. (Doc. 184). Plaintiff objected to the R & R on September 2, 2014 and on September 15, 2014, Defendants filed a brief in opposition to the objections. (Docs. 187–88). For the reasons set forth below, the R & R will be adopted.

### *Standard of Review*

When neither party objects to a magistrate judge's report and recommendation, the district court is not statutorily required to review the report under *de novo* or any other standard. *Thomas v. Arn,* 474 U.S. 140, 152, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 28 U.S.C. § 636(b)(1)(C). Nevertheless, the Third Circuit Court of Appeals has held that it is better practice to afford some level of review to dispositive legal issues raised by the report. *Henderson v. Carlson,* 812 F.2d 874, 878 (3d Cir.1987), *writ denied* 484 U.S. 837, 108 S.Ct. 120, 98 L.Ed.2d 79 (1987); *Garcia v. I.N.S.,* 733 F.Supp. 1554, 1555 (M.D.Pa.1990) (Kosik, J.) (stating "the district court need only review the record for plain error or manifest injustice"). In the absence of objections, re-

---

**1.** The matter was referred to Magistrate Judge Karoline Mehalchick on July 15, 2013.

view may properly be limited to ascertaining whether there is clear error that not only affects the rights of the plaintiff, but also seriously affects the integrity, fairness, or public reputation of judicial proceedings. *Cruz v. Chater,* 990 F.Supp. 375, 377 (M.D.Pa.1998) (Vanaskie, J.). When objections to a report and recommendation have been filed, the court must make a *de novo* determination of those portions of the report to which specific objections are made. *Sample v. Diecks,* 885 F.2d 1099, 1106 n. 3 (3d Cir.1989); *Goney v. Clark,* 749 F.2d 5, 6–7 (3d Cir. 1984). The written objections must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections." M.D. Pa. Local Rule 72.3. The court "may accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1)(C); Local Rule 72.3.

### Discussion

On February 1, 2013, the United States Court of Appeals for the Third Circuit granted Plaintiff's appeal and remanded this matter for further proceedings. (Doc. 78). It was determined that this Court "erred in finding that Thompson had not demonstrated that he had sincerely held religious beliefs regarding the communal meals and prayers for Christmas and Easter" and determined that judgment was inappropriate because the record contained little evidence regarding Defendants' penological interests supporting the policy. (Doc. 78–1, pp. 7–9). After further discovery, neither party has set forth sufficient evidence to establish judgment as a matter of law.

The Magistrate Judge thoroughly outlines the procedural history of this case, which neither party objects to, and it will be adopted. (Doc. 184, pp. 344–45); *see also* (Docs. 187–188). Magistrate Judge Mehalchick adequately set forth the standard for a motion for summary judgment in her R & R and that standard will be adopted. (Doc. 184, pp. 346–47). The Magistrate Judge first discusses Plaintiff's First Amendment claim, analyzing the *Turner*[2] factors and viewing the evidence of record in the light most favorable to Plaintiff, namely the number of inmates who would participate in the communal meals and whether Thompson is able to join in communal prayer in the dining hall, and determines that Defendants are not entitled to summary judgment because "the Court cannot conclude that the DOC's policy is legitimately and neutrally applied, and that the DOC's penological interests are served by allowing some religious meals and not others." (Doc. 184, pp. 347–51). With regard to Plaintiff's RLUIPA claim, Magistrate Judge Mehalchick discusses the same factual dispute regarding the number of Christian inmates who would participate in analyzing whether Defendants have a compelling governmental interest and whether denial of the meals is the least restrictive means of furthering that interest, and finds that neither party is entitled to summary judgment. (Doc. 184, pp. 345–46).

Plaintiff and Defendants make several arguments with regard to the R & R which are reiterations of previous arguments for summary judgment and need not be given *de novo* review. This Court, having reviewed those arguments, finds no clear error in the Magistrate Judge's recommendation. *See* (Docs. 164, 168, 187, & 188). Plaintiff makes one specific objection which, although the assertion was also

---

**2.** *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)

specifically set forth in his prior filings, will be given *de novo* review.

Magistrate Judge Mehalchick concludes "there are several factual disputes surrounding the number of inmates who would be eligible to participate in Thompson's proposed Christmas and Easter communal meals." (Doc. 184, p. 345). Plaintiff objects to the R & R arguing that there is no dispute that the maximum number of inmates who would be eligible to attend the communal meals would be three-hundred seven (307), substantially similar to the number of inmates eligible to participate in Muslim religious feasts. (Doc. 187, pp. 2–8). Defendants contest this factual averment. (Doc. 188, p. 4). After a complete review of the record, the Undersigned is in agreement with the Magistrate Judge that the number of inmates who could attend the meal is still disputed. Further, what precisely the meals would entail, their location, and their costs are still unclear. The parameters of the prison policy in question have not been adequately established by either party and, accordingly, a determination on the reasonableness of the policy cannot be made. Judgment at this stage is not possible and is not appropriate.

The United States Third Circuit Court of Appeals remanded this matter for further development of the record. While the record has been further developed by discovery, there are still factual disputes at every aspect of the four factors set forth in *Turner* and the elements of a RLUIPA claim including not only the number of inmates who could attend but also the capacity required, costs, security concerns, and impact on other inmates from providing separate communal meals to some Christian inmates. This matter would be most appropriately resolved by a bench trial.[3] *See Hampton v. Wetzel*, 2014 WL 1312013, 2014 U.S. Dist. LEXIS 43207 (M.D.Pa.2014) (denying motions for summary judgment on First Amendment, Fourteenth Amendment, and RLUIPA claims and setting for trial); *Holy Name Society v. Horn*, 2001 WL 959408, 2001 U.S. Dist. LEXIS 12756 (E.D.Pa.2001) (holding non-jury trial on First Amendment and Fourteenth Amendment claims involving requests for meals); *see also Rogers v. US*, 696 F.Supp.2d 472, 490, n. 14 (W.D.Pa.2010) (concluding that *Turner* analysis is exceedingly fact intensive requiring a contextual, record sensitive analysis), *citing Wolf v. Ashcroft*, 297 F.3d 305, 308 (3d Cir.2002), *also citing Johnson v. Guiffere*, 2007 WL 3046703, *6, 2007 U.S. Dist. LEXIS 98781, *6 (N.D.N.Y.2007) ("Such an inquiry [under *Turner*] is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment.").

### Conclusion

Plaintiff's objection to Magistrate Judge Mehalchick's Report and Recommendation will be overruled and the Report and Recommendation will be adopted. The summary judgment motions of both parties will be denied.

A separate Order will be issued.

---

**3.** Plaintiff's sole request for relief is equitable and pursuant to the Seventh Amendment he is not entitled to trial by jury. *See Scott v. DiGuglielmo.*, 615 F.Supp.2d 368 (E.D.Pa. 2009) (denying a jury trial on a prisoner's First, Eighth, and Fourteenth Amendment claims because they are equitable), *citing Cox v. Keystone Carbon Co.*, 861 F.2d 390, 393 (3d Cir.1988) (When "the remedy is explicitly equitable, then there is no seventh amendment right to a jury trial."), *citing Curtis v. Loether*, 415 U.S. 189, 194, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *see also Ali v. Quarterman*, 434 Fed.Appx. 322, 326 (5th Cir.2011) (determining claims under the First and Fourteenth Amendment and the RLUIPA for only declaratory and injunctive relief do not require trial by jury).

## ORDER

NOW, THIS 16th DAY OF OCTOBER, 2014, for the reasons set forth in the Memorandum issued this date, **IT IS HEREBY ORDERED THAT:**

1. The Report and Recommendation (Doc. 184) is **ADOPTED;**

2. Plaintiff's Objections (Doc. 187) are **OVERRULED;**

3. Defendants' motion for summary judgment (Doc. 163) is **DENIED;**

4. Plaintiff's motion for summary judgment (Doc. 167) is **DENIED;** and

5. Within twenty (20) days of the date of this Order, the parties are **DIRECTED** to confer and file a letter indicating whether or not all parties consent to proceed to trial before a Magistrate Judge. *See* M.D. Pa. L.R. 72.1(b); 28 U.S.C. § 636(c)(1).

## *REPORT AND RECOMMENDATION*

KAROLINE MEHALCHICK, United States Magistrate Judge.

Plaintiff Jeffrey Thompson, an inmate currently incarcerated at the State Correctional Institution at Camp Hill, Pennsylvania (SCI Camp Hill) filed this civil rights action pursuant to 42 U.S.C. § 1983 on February 22, 2011. (Doc. 1). Thompson alleges a violation of his right to free exercise of religion under the First Amendment of the Constitution, his right to equal protection under the Fourteenth Amendment of the Constitution, and his rights under the Religious Land Use and Institutional Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1 *et seq.* Pending before this Court is Defendants' motion for summary judgment (Doc. 163) and Plaintiff's motion for partial summary judgment (Doc. 167).

## I. BACKGROUND AND PROCEDURAL HISTORY

Thompson filed this complaint against the following defendants: Shirley Moore Smeal, Deputy Secretary of the Pennsylvania Department of Corrections; Rev. Ulli Klemm, Administrator for Religion and Volunteer Services; and Andrea Priori Meintel, Director of Bureau Treatment Services. Thompson alleges that in September 2009, he submitted an Inmate Religious Accommodation Request Form to the Pennsylvania Department of Corrections' (DOC) officials requesting that Christian inmates at SCI Camp Hill be permitted to congregate for special feasts at Christmas and Easter. (Doc. 164, p. 5). The Religious Accommodation Review Committee ("RARC")[1] recommended to Deputy Secretary Smeal that the request for separate feasts for Christian inmates at Easter and Christmas be denied. (Doc. 164, p. 5). Smeal concurred with the recommendation and denied the request. (Doc. 164, p. 5).

On February 22, 2011, after exhausting the administrative process, Thompson filed the instant civil rights action. (Doc. 1). Following discovery, both parties filed motions for summary judgment and on February 3, 2012, 2012 WL 719085, the magistrate judge filed a Report and Recommendation recommending that Defendants' motion be granted and that Thompson's motion be denied. (Doc. 55). Thompson did not object, and on March 1, 2012, the district judge adopted the recommendation and dismissed the complaint. (Doc. 58). On March 7, 2012, Thompson filed a motion to reopen the case, alleging that he had not received a copy of the

---

1. The Religious Accommodation Review Committee is comprised of various Religious Faith Group Leaders and Central Office Staff, and considers each inmate's request for a group religious service and forwards a recommendation to the appropriate Regional Deputy Secretary. *Smith v. Kyler*, No. 03–0898, 2008 WL 474252, at *2 (M.D.Pa. Feb. 20, 2008).

Report and Recommendation. (Doc. 59). The district judge granted the motion and Thompson filed objections to the Report and Recommendation. (Doc. 61). On April 19, 2012, 2012 WL 1377035, the district judge overruled Thompson's objections, and the Court granted Defendants' motion for summary judgment, denied Thompson's motion for summary judgment, and dismissed the complaint. (Doc. 66).

Thompson appealed and on February 1, 2013, the Court of Appeals for the Third Circuit vacated the district court's order of April 19, 2012, and remanded the case for further proceedings. *Thompson v. Smeal,* 513 Fed.Appx. 170, 174 (3d Cir.2013) (unpublished per curiam decision); (Doc. 78–1). On February 11, 2013, following remand, this Court entered an Order (Doc. 76) reopening discovery with respect to the issues identified by the Court of Appeals, including information relating to the *Turner* factors as they apply to Thompson's constitutional claims and his RLUIPA claim. On February 21, 2014, both parties filed motions for summary judgment. (Doc. 163; Doc. 167). Defendants filed a motion for summary judgment on Thompson's First Amendment and RLUIPA claims (Doc. 163), with an accompanying brief in support (Doc. 164) and statement of material facts. (Doc. 166). Thompson filed a motion for partial summary judgment on his RLUIPA claim (Doc. 167), with an accompanying brief in support (Doc. 168) and statement of material facts. (Doc. 172). Neither party moved for summary judgment on Plaintiff's Fourteenth Amendment claim. On July 21, 2014, Thompson filed a supplemental brief in light of the Supreme Court's *Burwell v. Hobby Lobby* decision, *Burwell v. Hobby Lobby Stores, Inc.,* — U.S. ——, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). (Doc. 183). Both motions are briefed and the matter is ripe for this Court's disposition.

## II. STATEMENT OF MATERIAL FACTS

Plaintiff Jeffrey Thompson is an inmate incarcerated at the State Correctional Institution at Camp Hill, Pennsylvania. SCI Camp Hill is divided into a Central Diagnostic and Classification Center (CDCC) that houses new inmates being diagnosed for treatment programming and long-term institutional placement, and general population inmates who are assigned to SCI Camp Hill as their permanent or long term institutional placement. (Doc. 166, ¶ 38). CDCC inmates are commonly referred to as "blues" and general population inmates as "browns." (Doc. 166, ¶ 46). Blues represent about 2/3 of the inmates at SCI Camp Hill, or approximately 2,400 inmates. Browns represent the remaining third, or approximately 1,200 inmates. (Doc. 166, ¶ 47). Fourteen percent of the inmates at SCI Camp Hill self-identify as Muslim, 16% as Catholic, and 20% as Protestant. (Doc. 166, ¶ 48).

In the instant case, there are several factual disputes surrounding the number of inmates who would be eligible to participate in Thompson's proposed Christmas and Easter communal meals. First, there is a dispute as to whether the Christian blues would be able to attend the proposed meals, or whether Thompson is asking for a similar set-up as that allowed for the Muslim brown population. (Doc. 166, ¶ 74; Doc. 175, ¶ 74). Only Muslim browns are eligible to attend the Muslim Eid feasts because there are optional menu items for purchase permitted at those feasts. (Doc. 166, ¶¶ 68–71). Thompson's request does not specify whether Christian blues would be eligible to attend the Easter and Christmas communal meals.

Defendants aver that "Plaintiff Thompson is not asking for special items to be made available for purchase for the Christ-

mas and Easter meals. This means Corrections personnel have to assume that all Christian inmates who qualify to attend special meals for those holidays will do so." (Doc. 166, ¶¶ 72–73; Doc. 165–1, ¶¶ 38–39, p. 5). Defendants assert that anywhere from 307 (brown inmates only) to 841 (browns and blues) Christian inmates at SCI Camp Hill would participate in a communal religious meal for Christmas and Easter. (Doc. 174, p. 5). Thompson disputes this and states that participation in religious feasts would be limited to general population inmates. (Doc. 172, ¶ 23; Doc. 175, ¶ 72). Thompson argues that if this number is limited, the way it is for other religions and their group meals, only general population inmates should be considered. "Limiting participation to general population inmates would reduce the maximum number of eligible inmates for the communal Christian meals to a number close to 200." (Doc. 174, p. 6). Thus, there is a dispute as to the eligibility criteria for those participating in the communal meal.

Additionally, the parties dispute whether Thompson is requesting optional, for purchase food items at these meals, which would limit the number of eligible participants. Thompson's Religious Accommodation Request Form submitted in September 2009 requests: "the same menu as the Eid feasts except Ham instead of Lamb and no Dates." (Doc. 175, ¶ 72). It is unclear whether Thompson is requesting that special items be made available for purchase for the Christmas and Easter meals. (Doc. 166, ¶ 72; Doc. 175, ¶ 72). Thompson argues that the DOC incorrectly assumes that the Christian communal meals would not include optional foods purchased by the inmates, and that he proposed menus for the Easter and Christmas meals that include food for purchase. (Doc. 174, p. 6). Thompson concludes that "the number of Christian inmates eligible to participate in communal religious meals would be substantially similar to the number of Muslim inmates eligible to participate in such meals if the same eligibility criteria were applied to both groups." (Doc. 174, p. 6). Thompson states that he seeks to replicate a similar communal meal as that already engaged in by the Muslim population.

In response, Defendants assert that Thompson's argument is prejudicial because it was not advanced from the forefront. Defendants argue that Thompson stated for the first time in an additional declaration attached to his summary judgment motion that he discussed with Rev. Mills the notion of menus with optional items that could restrict the number of potential participants at the proposed feasts. (Doc. 180, p. 3). Defendants argue that Thompson has now altered a "major factual premise of this case at a time when discovery has already been closed." Thompson asserts two arguments in response: first, he states that he has made his desire to include optional menu items in communal Christian meals clear since the very beginning of this case (Doc. 182, p. 2); and second, Thompson asserts that the DOC did not depose Thompson or serve him with any interrogatories related to the communal meals. (Doc. 182, p. 2).

Lastly, even if the communal meals were limited to browns-only, the parties dispute the number of browns who would be eligible for the meals. While Defendants estimate that there are approximately 307 Christian browns who would qualify for the holiday meal (Doc. 166, ¶ 74), Thompson estimates this number at around 220 inmates. (Doc. 175, ¶ 74). Further, Thompson estimates that "[a]ctual attendance at the religious feast would be significantly reduced based on indigency, using the percentage provided by the DOC for Muslim attendance ... roughly 66–88

Christian Browns would be both eligible to participate in and able to pay for the optional items." (Doc. 175, ¶ 74). Thompson asserts that the Christian population eligible for prospective communal meals is substantially similar to the Muslim population eligible for already-existing communal meals. (Doc. 168, p. 19).

### III. SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir.1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

### IV. DISCUSSION

Defendants move for summary judgment on Thompson's First Amendment claim and Thompson's RLUIPA claim. First, with respect to the First Amendment claim, Defendants argue that their actions were reasonably related to legitimate penological interests, and therefore did not violate the First Amendment. Next, with respect to the RLUIPA claim, Defendants argue that their actions were in furtherance of a compelling governmental interest and were the least restrictive means of furthering that interest. Thompson moves for summary judgment on the RLUIPA claim only, arguing that Defendants' actions were not the least restrictive means of furthering a compelling governmental interest.

### A. FIRST AMENDMENT CLAIM

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const. amend. I. Although Thompson is incarcerated, the Supreme Court has made it clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citation omitted). But "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). "The limitations on the exercise of

constitutional rights arise both from the fact of incarceration and from valid penological objectives—including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone,* 482 U.S. at 348, 107 S.Ct. 2400. "Thus, a prison inmate 'retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *DeHart v. Horn,* 227 F.3d 47, 51 (3d Cir.2000) (en banc) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)); *see also Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) ("[R]easonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First . . . Amendment without fear of penalty.").

As a threshold matter, "[t]he mere assertion of a religious belief does not automatically trigger First Amendment protections. . . . To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart,* 227 F.3d at 51. In the present case, Defendants do not dispute that Thompson's belief in the necessity of communal meals and prayers is sincerely held. (Doc. 172, ¶ 10; Doc. 179, p. 1). This threshold requirement of a "sincerely held religious belief" applies to Thompson's RLUIPA claim as well. *Cutter v. Wilkinson,* 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) ("Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion . . ., the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity.").

In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court of the United States articulated the standard for reviewing a prison regulation challenged on constitutional grounds. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254. *Turner* identified the following four factors for a court to consider in assessing the ultimate reasonableness of a prison regulation: (1) "whether the regulation bears a Valid rational connection' to a legitimate and neutral government objective;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) "the absence of ready alternatives." *Turner,* 482 U.S. at 89–90, 107 S.Ct. 2254; *see also Fraise v. Terhune,* 283 F.3d 506, 513–14 (3d Cir.2002) (citations omitted).

■ As the Third Circuit has observed, *Turner* did not expressly state which party bears the burden of proving each of these four factors. *Sharp v. Johnson,* 669 F.3d 144, 156 (3d Cir.2012). Thus, the Third Circuit has developed a two-step, burden-shifting analysis under *Turner.*

> First, the prison has the burden of demonstrating the First *Turner* Factor. This burden is slight, and in certain instances, the connection may be a matter of common sense. Second, if the prison meets its burden under the First *Turner* Factor, then we consider the [Second, Third, and Fourth] *Turner* Factors.

*Sharp,* 669 F.3d at 156.

Although the prisoner-plaintiff bears the "ultimate burden of persuasion with regard to the reasonableness of a regulation," the prison is first required to "put forward the legitimate governmental interest alleged to justify the regulation and demonstrate that the policy drafters could

rationally have seen a connection between the policy and that interest." *Sharp,* 669 F.3d at 156 (quoting *Jones v. Brown,* 461 F.3d 353, 360–61 (3d Cir.2006) (alterations omitted)).

### 1. The First *Turner* Factor

 The First *Turner* Factor is the existence of "a valid, rational connection between the prison regulation and the legitimate governmental interest." *DeHart,* 227 F.3d at 51. "A prison regulation fails this prong if it promotes an interest that is illegitimate or not neutral, or ... bears no valid, rational connection to the asserted interest." *Fraise,* 283 F.3d at 516. As noted above, Defendants bear the burden of coming forward with the requisite legitimate governmental interest. "This burden, though slight, must amount to more than a conclusory assertion." *Jones,* 461 F.3d at 360.

The policy at issue is the DOC's refusal to provide Christmas and Easter communal meals for Christians only, with group prayer over the food. (Doc. 164, p. 20). Defendants assert that allowing inmates to separately congregate for holiday meals and prayer would have a significant impact on prison resources because of the number of inmates in Pennsylvania's correctional institutions. On appeal, the Third Circuit noted that this "conclusion is not supported by the materials in the record, and it is unclear what penological interests are served by allowing some religious meals and not others." *Thompson v. Smeal,* 513 Fed.Appx. 170, 173 (3d Cir.2013). On remand, Defendants engaged in an extensive discussion of the complications of providing a full-service holiday meal to Christian inmates. Defendants conclude that SCI Camp Hill is unable to accommodate this request because of physical plant limitations, security issues, staff morale and food safety concerns. (Doc. 164, p. 20). Defendants point to the affidavits of Scott Fair,

Paul R. Legorre, Jr., Marcia Noles, and Rev. Orville L. Mills, who presented evidence that dining seating for approximately 307 Christian browns could not be accommodated in the chapel; there would be security issues due to disruption of the routine inmate movement patterns; there are issues of food transport and serving; and difficulties in finding chaplains. (Doc. 164, pp. 20–21). Thus, Defendants argue, "there are numerous valid rational connections between the policy and the legitimate governmental interests."

Although these are valid and legitimate concerns on their face, Thompson presents the issue as to whether these policies are neutral, and as the Third Circuit noted in this case, whether penological interests are served by allowing some religious meals and not others. Thompson asserts that Christianity, the religious group with whom he identifies, is the only religious group that is subject to these meal limitations. Thompson argues that, while Defendants may present legitimate governmental interests, they are not being applied neutrally to all religious groups and "[i]f the DOC applied the same eligibility criteria for participating in a Christian holy feast that it applies to Muslim holy feasts, the number of inmates participating in each would be substantially similar." (Doc. 174, p. 2). While Defendants base their assessment on the premise that 307 inmates would participate in the Christian meals, Thompson "estimates a maximum attendance of fewer than 100 inmates, with the number likely falling in the range of 65–85." (Doc. 174, p. 9).

The number of Christian inmates who would participate in the proposed communal meals is clearly in dispute. Because of the discrepancies in numbers, the Court must view the facts in the light most favorable to the non-moving party, the plaintiff.

*See Pastore*, 24 F.3d at 512 ("where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true"). Here, Thompson presents evidence that the number of participants in his proposed communal meals would be the same as the number of participants in the Muslim feasts, which SCI Camp Hill currently allows. Based on this evidence, the Court cannot conclude that the DOC's policy is legitimately and neutrally applied, and that the DOC's penological interests are served by allowing some religious meals and not others. Thus, summary judgment is inappropriate as to this prong.

### 2. The Second *Turner* Factor

■ The Second *Turner* Factor is "whether [Thompson] retain[s] alternative means of exercising the circumscribed right." *DeHart*, 227 F.3d at 51. "[T]he 'right' which is being circumscribed is [the] right to free religious expression." *DeHart*, 227 F.3d at 54. As a result, under the second *Turner* factor, the Court must inquire whether Thompson has "alternative means of exercising his [Christian] beliefs generally (*e.g.*, by prayer, worship, meditation, scripture study, etc.)." *DeHart*, 227 F.3d at 54.

> [W]here a prison regulation limits an inmate's ability to engage in a particular religious practice, the second prong of *Turner* requires an examination of whether there are other means available to the inmate for expressing his religious beliefs. If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable.
> *DeHart*, 227 F.3d at 57.

Defendants have presented evidence that Catholics and other Christians are afforded means of practicing their religion generally. It appears from the record that Thompson has alternative means of exercising his right to free religious expression. Thompson is free to silently pray over his food and he may invite others at his table to join him in prayer. (Doc. 164, p. 18). Thompson argues that this is not an available alternative means because group prayer in the dining room "would be strongly discouraged by prison staff and could result in threats to Mr. Thompson's safety." (Doc. 174, p. 10). Thompson further argues that, praying alone over his meal during the general service does not encompass the communal meal and prayer he seeks. To the extent Thompson argues that joining others in prayer in the public dining hall is not an option, this creates a factual dispute that must be resolved in Thompson's favor on summary judgment. The record is not fully developed as to whether Thompson may join in communal prayer in the dining hall, and thus based on the limited facts on this issue, the Second *Turner* Factor favors Thompson.

### 3. The Third and Fourth *Turner* Factors

The Third *Turner* Factor is "the costs that accommodating the right would impose on other inmates, guards, and prison resources generally." *DeHart*, 227 F.3d at 51. The Fourth *Turner* Factor is "whether there are alternatives to the regulation that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *DeHart*, 227 F.3d at 51.

Defendants engage in an extensive discussion of the prison resources that would be used to accommodate Thompson's request. Thompson argues that his request would pose no greater cost to prison resources than "the identical accommodations already offered to other faiths." (Doc. 174, p. 10). Further, Thompson suggests that the meals do not actually have to take place on Easter or Christmas so that the prison is not stressed on days

where it may be understaffed. Thompson states that the feasts could be held either on the holidays or on dates close in time to the holidays. (Doc. 172, ¶ 102). As already noted, there is a factual dispute as to how many inmates would be eligible to participate in the proposed communal meals. As such, the Court cannot adequately balance the costs against the asserted right at this time.

### 4. Balancing the *Turner* Factors

■ "*Turner* does not call for placing each factor in one of two columns and tallying a numerical result." *DeHart*, 227 F.3d at 59. Where "other avenues remain available for the exercise of the inmate's religious faith, courts should be particularly conscious of the measure of judicial deference owed to correction officials." *DeHart*, 227 F.3d at 59 (quoting *Turner*, 482 U.S. at 90, 107 S.Ct. 2254, and *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct.

2800, 41 L.Ed.2d 495 (1974)) (internal quotation marks and alterations omitted). At this juncture, the Court cannot assess whether denying Thompson's request for communal Christmas and Easter meals is legitimate in light of the fact that the number of participants is in dispute. Accordingly, viewing the evidentiary record, and the reasonable inferences therefrom, in the light most favorable to Thompson, the non-moving party, Defendants are not entitled to summary judgment with respect to Thompson's First Amendment claim at this time. As such, it is recommended that the Court **DENY** Defendants' motion for summary judgment on Plaintiff's First Amendment claim.

### B. *RLUIPA CLAIM* [2]

■ Both parties move for summary judgment on Thompson's RLUIPA claim.

---

2. Plaintiff submits that the *Hobby Lobby* decision, *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), supports his claims that being denied participation in Christian feasts imposes a substantial burden on his religious exercise under federal law, and that the wholesale denial is not the least restrictive means available to the DOC defendants for meeting their interests in prison security, food safety, and physical plant operations. It appears from their supplemental brief that Plaintiff is asserting the *Hobby Lobby* decision applies to Plaintiff's claims under the RLUIPA, but not his First Amendment and Equal Protection claims.

In *Hobby Lobby*, the Supreme Court considered whether RFRA applied to protect the activities of closely held, for-profit corporations. 134 S.Ct. at 2766–67. The Court described RFRA as having been enacted in response to the Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), *id.* at 2760–62, and as having expanded the protection of religious exercise beyond that required under the First Amendment. *Id.* at 2761–62. Turning to the issue of whether RFRA applied with respect to government requirements related to the activities of for-profit corporations, the

Court considered whether the term, "person," as used in RFRA included the closely held corporations before the Court. *Id.* at 2768–69. The Court was clear that it was only deciding the limited question before it—namely, whether closely held, for-profit corporations were protected under RFRA; the Court did not even go so far as to consider RFRA's applicability to publicly traded corporations. *Id.* at 2774 (in "ascertain[ing] the sincere 'beliefs' of a corporation," including those of large, publicly traded corporations, the Court explained that the case did not involve publicly traded corporations, and, "[i]n any event, we have no occasion in these cases to consider RFRA's applicability to such companies.")

The narrowly tailored decision of the Supreme Court in *Hobby Lobby* does not appear to expand or otherwise alter the applicable standard in this case. This Court is bound to follow the precedent articulated in 42 U.S.C. § 2000cc–1(a), that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest;

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson,* 544 U.S. 709, 721, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). The statute states that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

"Religious exercise" refers to "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion ..., the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113 (internal citation omitted).

■ "[A] substantial burden exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR (2) the government puts substantial pressure on an adherent to substantially modify his

behavior to violate his beliefs." *Washington v. Klem,* 497 F.3d 272, 280 (3d Cir. 2007). If an inmate satisfies his initial burden of showing that a practice substantially burdens his religious exercise, the burden then shifts to the government to show that the challenged policy "is in furtherance of a compelling governmental interest and is the least restrictive means" to further that interest. *Washington,* 497 F.3d at 283 (citing 42 U.S.C. § 2000cc–1(a)).

Here, there is no dispute that Thompson's belief in the necessity of communal meals and prayers is sincere and a substantial burden exists. *See Thompson v. Smeal,* 513 Fed.Appx. at 174. Thompson claims that his religious beliefs, the sincerity of which is not contested on summary judgment, require him to participate in communal meals and prayers for the Christmas and Easter holidays. Thus, the burden is on the government to show that the denial of such meals and prayers is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. *Washington,* 497 F.3d at 283.

■ Defendants assert that the compelling governmental interests are security, physical plant limitations, and food safety concerns. (Doc. 164, p. 24). Thompson agrees that prison security is a compelling interest, *Cutter,* 544 U.S. at 725 n. 13, 125 S.Ct. 2113; however, Thompson asserts that conclusory statements that a requested accommodation will negatively impact security are insufficient to meet the government's burden. *See Whitney v. Brown,* 882 F.2d 1068, 1073–78 (6th Cir.1989) (holding that prison officials' argument

---

and (2) is the least restrictive means of furthering that compelling governmental interest." *See also Washington v. Klem,* 497 F.3d 272 (3d Cir.2007). This Court does not find

that *Hobby Lobby* requires this Court to disregard the binding precedent of this Circuit, or in any other way alter its analysis of Plaintiff's claims.

that "[a]ny time the normal routine of an institution is altered, the good order and security of the facility are potentially compromised" did not justify ban on congregate Passover Seders for Jewish inmates). Similarly, costs to the institution from accommodating an inmate's religious exercise must be unduly burdensome to rise to the level of a compelling interest. *See* 42 U.S.C. § 2000cc–3(c) (RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise").

As to the "least restrictive means" prong, Thompson asserts that Defendants' ability to accommodate other religions and provide religious meals to other faiths demonstrates that it is able to accommodate a communal Christian meal. Thompson asserts that, even if the DOC can establish a compelling state interest, the DOC has failed to show that its outright refusal to allow Christian inmates to participate in a communal religious meal for Christmas and Easter is the least restrictive means of achieving these interests. (Doc. 168, p. 17; Doc. 174, p. 5). Thompson bases this argument on the assumption that the number of Christian inmates who would participate in these feasts would be substantially similar to the number of Muslim inmates who currently participate in communal feasts. (Doc. 174, p. 6–7). The only information proffered by Defendants in support of their position is that "the options of gymnasium dining, small group dining and alternative date dining are also unworkable. Therefore, the current policy is the least restrictive means for furthering the government's compelling interest." (Doc. 164, p. 24).

The Court finds that there is a genuine issue of material fact and that neither party is entitled to summary judgment on Thompson's RLUIPA claim. The premise of Defendants' argument is that the Christian population is too large to accommodate. As already discussed, the number of eligible Christian participants is in dispute. Without definitive numbers, the Court cannot discern whether denying Christian communal meals was the least restrictive means to achieving the alleged compelling interests. According to Thompson, the Chapel may be a viable option for the communal meals, as it has been successful for communal meals for other religions. Thus, a reasonable factfinder could find that providing Christmas and Easter meals to a limited number of Christians who are eligible to participate is the least restrictive means of furthering the compelling governmental interests of maintaining security, physical plant limitations, and food safety. *Williams v. Secretary Pennsylvania Dept. of Corrections,* 450 Fed. Appx. 191, 196 (3d Cir.2011). However, this assumes a smaller participation number than the number relied on by Defendants. At this time, there are simply too many factual disputes surrounding how many participants would be included in these communal meals, how the participation would be limited based on eligibility, and whether such a number, if finally determined, is actually similar to the participation numbers of other religious groups. Accordingly, based on the evidentiary record, the Court finds that neither Defendants nor Thompson are entitled to summary judgment with respect to Thompson's RLUIPA claim.

## V. RECOMMENDATION

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment (Doc. 163) be **DENIED** and that Plaintiff's motion for partial summary judgment (Doc. 167) be **DENIED.**

Dated: July 30, 2014.